FILED

2020 Nov-02  PM 10:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| CARRIE JEAN HUFFMAN, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF TERRY TERRELL PETTIWAY, DECEASED,<br><br>     Plaintiff,<br><br>v.<br><br>JEFFERSON DUNN; GRANTT CULLIVER; EDWARD ELLINGTON; KARLA JONES; DEWAYNE ESTES; GWENDOLYN GIVENS; ANTHONY BROOKS; CEDRIC SPECKS; KEVIN WHITE; GARY MALONE; RUSSELL JONES; PHILLIP DIXON; RAFAEL SANTA-MARIA; UNKNOWN SHIFT COMMANDERS; and UNKNOWN CORRECTIONAL OFFICERS,<br><br>     Defendants. | Civ. A. No.: 4:20-cv-01293-CLM<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiff Carrie Jean Huffman, as personal representative of the Estate of Decedent Terry Terrell Pettiway, by her attorneys Sidley Austin LLP and White Arnold & Dowd P.C., brings this civil rights action pursuant to 42 U.S.C. § 1983 arising from the death of Terry T. Pettiway at St. Clair Correctional Facility and states as follows:

## INTRODUCTION

1.      The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishments. This bedrock civil right enshrined in the Bill of Rights protects all Americans, and most fundamentally confers on those persons who are incarcerated the right to be free from known and unreasonable risk of serious harm while in custody. Terry Terrell Pettiway, a 29-year-old prisoner at the notoriously violent and unsafe St. Clair Correctional Facility (the "St. Clair Prison" or "St. Clair" or "Prison"), was denied this most basic constitutional and human right, when, on September 2, 2018, he was murdered by another inmate or inmates outside a prison housing block after attempting to break up a fight. Mr. Pettiway was repeatedly stabbed in the back and neck and left to bleed out while the housing block and the common areas around it were effectively left completely unattended by prison staff. No Prison personnel intervened either to prevent the altercation or provide medical assistance after the stabbing. Mr. Pettiway was left to rely on fellow prisoners for help, who attempted to administer CPR and transport him

- 2 -

to the prison command station.  Sadly, their efforts were unsuccessful.  At the time of the assault on and murder of Mr. Pettiway, the history of murder, rape, and other assaults at St. Clair, the easy availability of weapons among prisoners at St. Clair, the climate of expected violence at that facility, and the utter failure of the Alabama Department of Corrections, and each and every Defendant in this case to address these horrific conditions and to provide adequate staffing and security at St. Clair all were well known by each and every Defendant in this case. And still, despite this awareness, each and every Defendant in this case took inadequate actions or failed to act altogether, in deliberate, heartless, cruel, and tragic indifference to their obligations as protectors of Mr. Pettiway consistent with his rights under the Eighth Amendment.

2.     Plaintiff Carrie Jean Huffman, as personal representative of Decedent Terry Pettiway's estate, brings this action against Defendants for violation of her son's rights under the Eighth and Fourteenth Amendments to the United States Constitution.  Rather than fulfill their obligations to take reasonable measures to protect Mr. Pettiway from violence at the hands of other St. Clair inmates, the Defendants, acting under color of state law, instead enabled his murder, and, by their reckless or intentional failures to take actions to reasonably protect Mr. Pettiway from violence, deprived Mr. Pettiway of his most fundamental constitutional rights. Moreover, Defendants deprived Mr. Pettiway of his right to receive medical care for

- 3 -

a serious medical need under the Eighth Amendment after he suffered multiple stab wounds at the hands of a fellow prisoner. Plaintiff further brings this action for Mr. Pettiway's wrongful death, pursuant to Section 6-5-410 of the Alabama Code. Defendants had a duty to protect Mr. Pettiway from known and unreasonable risks of harm, including, to say the least, homicide by another inmate. By utterly failing to protect Mr. Pettiway from harm that was foreseeable in the nightmare that is St. Clair, Defendants are liable for the criminal acts of the assailant or assailants who killed Mr. Pettiway.

3. Mr. Pettiway's killing was not an anomaly. It was just another example of the rampant and systemic violence at St. Clair, where murders, rapes, stabbings, and beatings have become routine. Mismanagement, understaffing, poor leadership, overcrowding, inadequate security, and unsafe conditions have led to an extraordinarily high homicide rate, weekly stabbings and assaults, and a culture where violence is not adequately controlled or prevented by those in positions of authority who are entrusted with ensuring prisoner safety.

4. At the time of Mr. Pettiway's murder, these treacherous conditions were notorious and well known to each and every Defendant in this case. St. Clair's culture of extreme and commonplace violence, mismanagement and understaffing had been well documented in court documents, in detailed and repeated reports in the media, including media local to St. Clair, and in reports by non-profit organizations.

- 4 -

In addition, this horrific history and these intolerable conditions at St. Clair and other Alabama prisons triggered an investigation by the United States Department of Justice in 2016, and the DOJ's resulting report, issued following Mr. Pettiway's murder in 2018, was scathing and damning of the failures of ADOC and its hierarchy in administering prisons in Alabama, including St. Clair.  On information and belief based on their respective positions, responsibilities, and experience, each and every Defendant in this case was aware of the horrific and shocking circumstances recounted chapter and verse in the DOJ report.

5.     Instead of taking any actions that could have protected prisoners such as Mr. Pettiway and thereby prevented Mr. Pettiway's murder, Defendants did nothing, resulting in a situation on the day of Mr. Pettiway's death where a single prison guard was responsible for supervising the general population yard (the "Yard"), which was open to every inmate from eight separate cell blocks. Unsurprisingly, when, on information and belief, that single guard was distracted by an incident elsewhere, he was unaware that an altercation between two inmates had broken out near the Yard, which Mr. Pettiway attempted to break up.  When tensions escalated and Mr. Pettiway was stabbed fourteen to seventeen times, the guards were nowhere to be found.

6.     Each and every Defendant knew of the widespread history of excessive risk of inmate-on-inmate violence at St. Clair, which left Mr. Pettiway in substantial

danger of serious harm.  Despite this personal knowledge, each and every Defendant took no action – either at a policy level or at the prison on the day of the murder – to minimize the severe staffing shortages, availability of weapons, and culture of violence that caused Mr. Pettiway's untimely death.

7.     Accordingly, Plaintiff brings this action on behalf of Mr. Pettiway's estate seeking compensation to redress Defendants' deliberate indifference to the serious risk of harm to Mr. Pettiway's safety and deliberate indifference to Mr. Pettiway's serious need for medical care, which violated his Eighth Amendment rights under the U.S. Constitution, and for his wrongful death under Section 6-5-410 of the Alabama Code.

## PARTIES

8.     Plaintiff Carrie Jean Huffman is the duly appointed Personal Representative of the estate of Decedent Terry Pettiway, by the Probate Court of St. Clair County, Alabama.  Mr. Pettiway was incarcerated at St. Clair Prison for a parole violation from September 2017 until the time of his death.

9.     Defendant Jefferson Dunn was the Commissioner of the Alabama Department of Corrections ("ADOC") at the time of Mr. Pettiway's murder and is a resident of the State of Alabama.

10.     Defendant Grantt Culliver was the Associate Commissioner for Operations for the ADOC at the time of Mr. Pettiway's murder and is a resident of the State of Alabama.

11.     Defendant Edward Ellington was the Instructional Coordinator for the Northern Region of the ADOC at the time of Mr. Pettiway's murder and is a resident of the State of Alabama.

12.     Collectively, Defendants Dunn, Culliver, and Ellington are referred to as the "Defendant Administrative Supervisors."

13.     Defendant Karla Jones was the Head Warden at St. Clair at the time of Mr. Pettiway's murder and is a resident of the State of Alabama.

14.     Defendant Dewayne Estes was the Head Warden at St. Clair from approximately March 2015 until May 2018 and is a resident of the State of Alabama.

15.     Defendant Anthony Brooks was employed by the ADOC as Assistant Warden of the St. Clair Prison at the time of Mr. Pettiway's murder and is a resident of the State of Alabama.

16.     Defendant Gwendolyn Givens was employed by the ADOC as Assistant Warden at St. Clair Prison at the time of Mr. Pettiway's murder and is a resident of the State of Alabama.

17.     Defendant Cedric Specks was employed by the ADOC as Assistant Warden of the St. Clair Prison until May 2018 and is a resident of the State of Alabama.

18.     Defendant Kevin White was employed by the ADOC as a Captain at St. Clair Prison at the time of Mr. Pettiway's murder and is a resident of the State of Alabama

19.     Defendant Gary Malone was employed by the ADOC as a Captain at St. Clair Prison at the time of Mr. Pettiway's murder and is a resident of the State of Alabama.

20.     Defendant Russell Jones was employed by the ADOC as a Lieutenant at St. Clair Prison at the time of Mr. Pettiway's murder and is a resident of the State of Alabama.  Upon information and belief, Defendant Russell Jones was the on-duty Shift Commander at the time Mr. Pettiway was attacked.

21.     Defendant Phillip Dixon was employed by the ADOC as a Sergeant at St. Clair Prison at the time of Mr. Pettiway's murder and is a resident of the State of Alabama.  Upon information and belief, Defendant Dixon was on duty at the time Mr. Pettiway was attacked.

22.     Defendant Rafael Santa-Maria was employed by the ADOC as a Sergeant at St. Clair Prison at the time of Mr. Pettiway's murder and is a resident

of the State of Alabama.  Upon information and belief, Defendant Santa-Maria was on duty at the time Mr. Pettiway was attacked.

23.     Each of Defendants Unknown Shift Commanders was a shift commander on duty in the L/M and P/Q Blocks at the St. Clair Prison on the date of Mr. Pettiway's murder on September 2, 2018.

24.     Plaintiff refers collectively to Defendants Karla Jones, Estes, Givens, Brooks, Specks, White, Malone, Russell Jones, Dixon, Santa-Maria and Unknown Shift Commanders as "Defendant Prison Supervisors." Plaintiff asserts each and every allegation relating to "Defendant Prison Supervisors" individually as to each such Defendant included in such definition, and such pleading referring to such defined Defendants is for convenience and economy only and the avoidance of repetition, and is not intended to constitute group pleading.

25.     Defendants Unknown Correctional Officers were correctional officers at the St. Clair Prison at the time of the events at issue in Plaintiff's Complaint. Defendants Unknown Correctional Officers were responsible for supervising and monitoring Mr. Pettiway's housing unit and the areas where these events took place at the St. Clair Prison on September 2, 2018.

26.     Plaintiff refers collectively to Defendants Dunn, Culliver, Ellington, Karla Jones, Estes, Givens, Brooks, Specks, White, Malone, Russell Jones, Dixon, Santa-Maria, Unknown Shift Commanders, and Unknown Correctional Officers as

- 9 -

"Defendants."  Plaintiff asserts each and every allegation relating to "Defendants" individually as to each such Defendant included in such definition, and such pleading referring to such defined Defendants is for convenience and economy only and the avoidance of repetition.

27.    Plaintiff sues each of the Defendants in his or her individual capacity unless otherwise noted.  Each of the Defendants acted under color of state law when engaging in the misconduct described herein.

## JURISDICTION AND VENUE

28.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) because this action is brought under 42 U.S.C. § 1983, seeking damages for Defendants' violations of the constitutional rights of Decedent Terry Terrell Pettiway. This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29.    Venue appropriately lies in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims presented in this case occurred in the Northern District of Alabama.

## FACTUAL ALLEGATIONS

### A.  Decedent Terry Terrell Pettiway

30.  Terry Terrell Pettiway was born on July 25, 1989, in Montgomery, Alabama, to Carrie Jean Huffman, the Administrator of his estate and the Plaintiff in this case concerning the murder of her son while incarcerated at St. Clair.

31.  Growing up, Mr. Pettiway attended Branch Grove Baptist Church with his mother.  He attended school through the 10th grade.

32.  Mr. Pettiway was the father of three young children.  At the time of his death at St. Clair, Mr. Pettiway was father to Terriana, now age 12, Aiden, now age 4, and Ja'Terrica, now age 2.  Family members describe Mr. Pettiway as a good father and someone who was always willing to help others.

33.  In 2017, Mr. Pettiway was arrested while on probation and ordered to serve the remainder of his original sentence in prison.

34.  Upon information and belief, despite Mr. Pettiway's low level custody designation, he was assigned to serve his sentence at St. Clair, which is a "close custody" facility, the highest possible custody level for a prisoner in the ADOC system, reserved for the most dangerous and violent inmates.

35.     Moreover, at St. Clair, Mr. Pettiway was assigned to the Q housing block, which is designated for particularly violent and hostile inmates who pose a heightened risk of behavioral problems.

36.     At the time of his death while incarcerated at St. Clair, Mr. Pettiway was a mere *two weeks away* from parole eligibility.

37.     At the time of his death while incarcerated at St. Clair, Mr. Pettiway and his brother Terrance were looking forward to working together to build a trucking business following his release.  Mr. Pettiway was looking forward to getting his post-prison life on a good and law-abiding path.

## B.     While Attempting to Intervene in an Altercation, Mr. Pettiway Was Stabbed Repeatedly Outside the Unsupervised P/Q Housing Block at St. Clair Prison, and Left to Die with No Prison Staff at Hand.

38.     The factual allegations in Paragraphs 39 through 49 are based upon Plaintiff's information and belief.

39.     On the afternoon of September 2, 2018, Mr. Pettiway witnessed a verbal altercation between two inmates in the area just outside the P/Q cell block's entrance to the Yard.  This argument was the continuation of a broader conflict between rival gang members that had been escalating over the course of the day.

40.     Despite the increasing tensions amongst the prison population, there were only a total of four guards assigned to monitor the P/Q cell block and the Yard. A "cubicle officer," a guard stationed in a protected office tasked with observing

- 12 -

prisoner movements via line of sight and inoperative cameras, was assigned to monitor the approximately 96 inmates in the Q block and another was assigned to monitor the 96 inmates in the P block; another "rover" guard was responsible for monitoring approximately 192 inmates in both the P and Q blocks; and finally, a single officer was assigned to patrol the entire Yard, which sits in the middle of the eight general population blocks and can be accessed by more than 750 general population inmates.

41.    However, at the time this argument broke out, the officer assigned to the Yard, Defendant Unknown Correctional Officer, had been occupied responding to another incident in a different area.  As a result, the Yard was left unsupervised with no one to address the escalating situation outside the P/Q housing unit. Meanwhile, the "cubicle officers," Defendant Unknown Correctional Officers, could not see the altercation from their posts, and the roving officer, Defendant Unknown Correctional Officer, was not in the vicinity.

42.    With no St. Clair personnel present to address the altercation, Mr. Pettiway attempted to intervene in the altercation outside the P/Q block in the hopes of de-escalating the situation.  However, his attempt to mediate resulted in a disagreement between himself and another inmate who is suspected to be Gerard Pruitt.  Mr. Pruitt has been indicted by a Grand Jury for Mr. Pettiway's death and is scheduled to be tried in January 2021.

- 13 -

43.     As the argument between Mr. Pettiway and Pruitt continued to escalate, a large group of inmates began to gather around the two men, suspecting that the altercation would soon turn violent.  Still, none of the St. Clair prison staff, including Defendant Unknown Correctional Officers, intervened or were present.

44.     Ultimately, the argument between Mr. Pettiway and Pruitt became violent.  Pruitt and/or one or more additional assailants stabbed Mr. Pettiway fourteen to seventeen times in his back and neck.  Mr. Pettiway was not the aggressor in the altercation and was attempting to walk away when he was stabbed in the back.

45.     Mr. Pettiway was left bleeding out on the porch.  Still, no prison guard responded.  In fact, instead of St. Clair personnel, it was fellow inmates who took it upon themselves to try to save Mr. Pettiway.  Seeing Mr. Pettiway's grave condition and that no help was coming, the inmates placed Mr. Pettiway on a garbage cart and wheeled him toward the prison command station.

46.     At least 10 minutes after Mr. Pettiway had been wounded, Defendant Unknown Correctional Officer finally responded.  Once Unknown Correctional Officer arrived, he accompanied the large group of inmates transporting Mr. Pettiway to the command station on the garbage cart.

47.     Once at the command station, upon information and belief,  Unknown Correctional Officer refused to attend to Mr. Pettiway's injuries.  Instead, fellow

- 14 -

inmates attempted to treat Mr. Pettiway by dressing his wounds and administering CPR.

48.     At some point thereafter, Defendant Dixon and another officer, Defendant Unknown Correctional Officer, arrived, who, upon information and belief, also refused to provide Mr. Pettiway medical attention.  Mr. Pettiway's injuries were too severe to be addressed at the Prison, and the officers arranged for Mr. Pettiway to be taken to a hospital.

49.     Mr. Pettiway was pronounced dead at St. Vincent's East Hospital at 6:32 pm.  Plaintiff and her family members were notified of her son's death by other inmates at St. Clair, not by Prison personnel.

50.     Additional information concerning the circumstances surrounding the assault and murder of Mr. Pettiway while incarcerated at St. Clair Prison and under the care of the Defendants is uniquely in the possession of the Defendants and others, including any internal investigative report, notes, emails, communications and other records that Defendants and non-parties will be required to disclose in discovery. Tragically, Mr. Pettiway died at St. Clair, and is lost to Plaintiff and her family except in loving memory.  Neither Plaintiff nor her counsel can speak with Mr. Pettiway for those additional details that will await discovery and proof at trial.

51.     On the other hand, as set forth at length below, it is crystal clear that inmate-on-inmate violence and the prevalence of weapons and contraband among

prisoners at St. Clair Prison were widespread, well documented, and widely publicized, and that St. Clair Prison suffered widespread and chronic critical staffing shortages, broken locks, blind spots, and deficiencies in inmate supervision and search policies and procedures meant to protect inmates.  The evidence likewise is overwhelming that, by reason of their respective positions, responsibilities, and experience, each and every Defendant was aware of these horrific conditions and chronic failures, and was aware of his or her duty to take reasonable steps to keep inmates safe from violence, and thus that each and every Defendant individually failed to do his or her job to comport with Mr. Pettiway's constitutional right to be protected against cruel and unusual punishment.  For these Defendants' callous and deliberate indifference,  Mr. Pettiway paid the ultimate price, with his life.

## C.    There is a Widespread History of Abuse at St. Clair.

52.    As the facts below demonstrate, Mr. Pettiway and his fellow prisoners effectively lived in a war zone where violence and the threat of serious injury were constant.

### i.    There is a well-documented history of rampant inmate-on-inmate at the Prison.

53.    Deadly interactions between inmates such as the one that took Mr. Pettiway's life are not the exception at St. Clair.  They have been the well-documented norm for years.  Each and every Defendant was aware of the shocking

and intolerable conditions at St. Clair at the time of the assault and murder of Mr. Pettiway.

54.     As the United States Department of Justice (the "DOJ") has noted, in 2019, just 6 months after Mr. Pettiway's murder, Defendant Dunn admitted that "that the current level of violence [in Alabama prisons] is 'unacceptably high.'" As Defendant Dunn acknowledged even earlier, in 2017, and as *The New York Times* reported, it "wo[uldn't] be long until [Alabama prisons were] the most understaffed and most violent."

55.     Defendant Culliver testified at deposition (Culliver Tr. 298:11-18) in 2016 in *Duke v. Dunn*, 4:14-CV-1952-VEH (the "Duke Litigation") that "St. Clair is on the radar, particularly because of the number of incidents that we have, the amount of violence that we have there . . . ."

56.     Nationally-recognized corrections expert Steve J. Martin examined the conditions at the St. Clair Prison and opined in a 2016 expert report in the Duke Litigation: "The frequency of assaults resulting in life-threatening injuries is quite simply among the highest I have observed in my 43-year career in corrections." Each of the defendants in the Duke Litigation who also is a Defendant herein was aware of Mr. Martin's report and, on information and belief based on their respective positions, responsibilities, and experience, each and every Defendant

herein was aware of that report and the circumstances described therein at the time of Mr. Pettiway's assault and murder.

57.     In 2016, the DOJ initiated a Civil Rights of Institutionalized Persons Act ("CRIPA") investigation of Alabama prisons.  In April 2019, the DOJ released its findings from that investigation (the "2019 DOJ Report"), in which it concluded that, between 2016 and 2018, which includes the time period Mr. Pettiway was housed and killed in St. Clair Prison, violence and crime were so pervasive and extreme, and mismanagement was so egregious at Alabama prisons, including St. Clair, that there was "reasonable cause to believe . . . . the conditions in Alabama's prisons for men violate the Eighth Amendment of the U.S. Constitution."

58.     In particular, the DOJ found that "[t]he conditions in Alabama's prisons are objectively unsafe, as evidenced by the high rate of prisoner-on-prisoner homicides and violence, including sexual abuse," and that understaffing, overcrowding, corruption, and the prevalence of contraband in Alabama prisons all lead to the finding that "ADOC fails to protect prisoners from serious harm and a substantial risk of serious harm."

59.     The conditions at St. Clair leading up to and at the time of Mr. Pettiway's murder are not only consistent with the DOJ's conclusions, but are clearly some of the worst in the ADOC prison system, leading to a well-documented label, discussed further below, as one of the most dangerous prisons in America, as

- 18 -

reported in publications such as *The New York Times, Vice, Mother Jones,* and *Splinter*.

60.     Since 2010, reported assaults at the St. Clair Prison have increased dramatically.  Based on the ADOC's own statistics, in 2010, inmates reported 28 assaults; in 2011, 57 assaults; in 2012, 90 assaults; in 2013, 101 assaults; in 2014, 111 assaults; in 2015, 172 assaults; and in 2016, 240 assaults (marking an almost ten-fold increase in the number of reported assaults over a period of six years).  By September 2018, inmates had reported a total of 122 assaults for the first nine months of that calendar year.

61.     Among the 35 prisoner homicides committed in Alabama prisons between 2013 and 2018, 9 occurred in St. Clair.

62.     In 2014, the Equal Justice Initiative ("EJI") reported that the homicide rate for the St. Clair Prison was approximately 232.4 per 100,000 inmates.  This represented a homicide rate 33 times higher than the national homicide rate for state prisons in 2014 of approximately seven homicides per 100,000 inmates, as reported by the U.S Bureau of Justice Statistics.  In 2018, the year of Mr. Pettiway's murder, the homicide rate at St. Clair increased to approximately 418 homicides per 100,000 incarcerated people, which is more than 50 times higher than the reported national average for state prisons in 2016—the most recent year for which this figure has been calculated—of 8 homicides per 100,000 prisoners.  On information and belief,

- 19 -

based on their respective positions, responsibilities, and experience, each and every Defendant was aware of EJI's analysis and the circumstances described therein at the time of Mr. Pettiway's assault and murder.

63.     The ADOC prepares and releases its own statistics and information concerning, among other things, violence at St. Clair, of which, on information and belief, based on their respective positions, responsibilities, and experience, each and every was aware at the time of Mr. Pettiway's assault and murder, as well as the circumstances underlying such statistics as they related to St. Clair Prison. According to the ADOC's own statistical report September 2018 alone, the month Mr. Pettiway was murdered, there was an additional inmate-on-inmate homicide, 11 assaults involving inmates and/or staff, and a prisoner suicide.  By the end of September 2018, the Associated Press reported that St. Clair accounted for half of the year-to-date homicides occurring in the ADOC system.

64.     In October 2014, EJI filed a class action lawsuit on behalf of inmates at the St. Clair Prison, seeking injunctive relief to reduce the ongoing violence at the St. Clair Prison, *Duke v. Dunn*, 4:14-CV-1952-VEH (N.D. Ala.).

65.     The *Duke* Complaint, as amended, described the policies and practices fueling the outbreak of violence at the St. Clair Prison, including the failure of Defendant Administrative Supervisors and Defendant Prison Supervisors to address the widespread proliferation of contraband weapons at St. Clair.  The lawsuit also

recounted the creation of a dangerous culture of violence and abuse, the failure to appropriately respond to violence and rape, and inadequate staffing, supervision, and monitoring of St. Clair.

### ii. St. Clair inmates have ready access to weapons and contraband.

66.     In 2017, *The New York Times* reported that the estimated percentage of inmates at St. Clair that are armed with some kind of weapon "run from well over half to just about everyone."  On information and belief, based on their respective positions, responsibilities, and experience, each and every Defendant was aware of the report in *The New York Times* and the circumstances described therein at the time of Mr. Pettiway's assault and murder.

67.     In a January 2017 report in the *Montgomery Advertiser*, former St. Clair correctional officer Jonathan Truitt was quoted as stating that weapon contraband was "out of control" and that inmates were "assaulted in every way imaginable."  Truitt noted that a single 24-person cell block at the St. Clair Prison could contain "30 to 40" contraband knives.  Between 2015 and 2017, Prison personnel found ammunition and firearms at least three times at the St. Clair Prison. On information and belief, based on their respective positions, responsibilities, and experience, each and every Defendant was aware of the report in the *Montgomery Advertiser* and the circumstances described therein at the time of Mr. Pettiway's

- 21 -

assault and murder.  Moreover, as the 2019 DOJ Report noted, a weapon that was essentially a small sword was recovered at St. Clair in 2017.

68.     Knives and other prison-made weapons were and are common throughout the St. Clair Prison and, upon information and belief, have been used in approximately 150 murders and assaults at St. Clair Prison since 2015, circumstances of which each and every Defendant, on information and belief based on their respective positions, responsibilities, and experience, was aware at the time of Mr. Pettiway's assault and murder.

69.     At the time of Mr. Pettiway's murder, it was common knowledge among staff at the St. Clair Prison that the inmate population was heavily armed, and that some Prison personnel actually encouraged inmates to obtain and use weapons.   On information and belief, based on their respective positions, responsibilities, and experience, each and every Defendant was aware of these circumstances at the time of Mr. Pettiway's assault and murder.

a. For example, WBRC Fox 6 in Birmingham reported that Prison personnel sold two St. Clair inmates hacksaw blades, bolt cutters, and a handgun that they then used to escape in 2017.

b. Similarly, an inmate who was later stabbed repeatedly by another inmate, Michael McGregor, alleged in his complaint against many of the same defendants named in this action that "[w]hen [he]

- 22 -

arrived at St. Clair, a correctional officer immediately told him about the rampant violence at St. Clair and advised him that he would need a knife."

    **c.** St. Clair inmate Robert Woods was reassigned by an officer to a violent block where he was vulnerable because of his advanced age at the time and physical disability.  When he expressed fear for his safety to the officer, the officer responded that he would get Mr. Woods a knife if he did not already have one.  When Mr. Woods later requested again to be moved from the block after he was the victim of a theft, the officer responded by placing several box cutters on a table and telling Mr. Woods to make a knife to protect himself.

70.    One former correctional officer, David Ellis, recalled to a WBRC Fox 6 (Birmingham) reporter seeing knives made out of vent slats, ice picks sharpened from copper plumbing rods, and homemade zip guns fashioned with a wooden block, a nail, rubber bands, and a bullet.

71.    Mr. Ellis recalled further to WBRC Fox 6, an encounter with an inmate carrying a sword inside the St. Clair Prison in 2017.  Mr. Ellis stepped into the G-Gate "guard shack," and two minutes later an inmate was standing outside pointing a sword toward Mr. Ellis's chest.  On information and belief, based on their

respective positions, responsibilities, and experience, each and every Defendant was aware of the WBRC report and the circumstances described therein.

72.     Each of the foregoing facts is publicly available and each Defendant was personally aware of the substantial risk of violence inmates faced each day just by being incarcerated at St. Clair Prison due to the proliferation of weapons and lack of supervision.   Nevertheless, each Defendant deliberately failed to take reasonable steps to address and reduce the risk of violence.

> **iii.     St. Clair has been plagued by critical staffing shortages, broken locks, blindspots and deficiencies in inmate supervision and search policies and procedures meant to protect inmates.**

73.     As documented in the 2019 DOJ Report, and as already known by each and every Defendant, the St. Clair Prison was dangerously understaffed at the time of Mr. Pettiway's murder.

74.     The 2019 DOJ Report noted that, as of June 2018 —just three months prior to Mr. Pettiway's murder—St. Clair Prison employed a mere 28% of its authorized correctional officers, which posed a severe understaffing problem.  As alleged above, on information and belief, based on their respective positions,

responsibilities, and experience, each and every Defendant was aware of the historical and continuing circumstances described in the DOJ Report.

75.    By way of example, Defendant Culliver testified at deposition in 2016 in the Duke Litigation (Culliver Tr. at 114:6-8) that, at St. Clair, "The staffing is short; the staffing is less than desirable; we need to augment this staffing."

76.    Because of this severe understaffing, the limited number of correctional officers employed at the St. Clair Prison were overworked.

77.    For example, ABC 33/40 of Birmingham reported that one St. Clair captain worked so much overtime that he received the most overtime pay of any Alabama state employee for four consecutive years. In 2017, that captain made a total of almost $121,000, nearly as much as the Governor of Alabama's salary. The officer's base salary was approximately $38,000.

78.    The chronic understaffing, and the overworking of that staff, at St. Clair Prison interfered with critical security functions, including monitoring of inmates and conducting regular prison-wide searches for contraband, circumstances of which each and every Defendant was aware.

79.    The general population housing units at St. Clair generally house approximately 96 inmates, with a single correctional officer assigned to supervise the entire block from a protected "cubicle." This "cube," which has windows that

give the officer limited sight lines into both sides of the block, leaves much of the block and the Yard outside of the officer's vision.

80.     Upon information and belief, although St. Clair has installed cameras to cover the areas that cannot be seen from the cube, those cameras rarely if ever are operational due to malfunction and/or damage intentionally inflicted by prisoners.

81.     Normally, an officer is also assigned as a "rover" to patrol the housing blocks.  However, because of a dangerous level of understaffing at the St. Clair Prison, rover officers are often pulled away from patrolling in order to escort inmates and to serve in other capacities.

82.     The correctional officer stationed in the "cube" typically was the only officer monitoring Mr. Pettiway's housing unit.  These officers were at times absent, asleep, or otherwise not paying attention to the inmates they were monitoring.  For example, Defendant Culliver testified at deposition in the Duke Litigation (Culliver Tr. at 160:17-22) that searches of inmates' cells are "not being conducted every day . . . . I didn't do the cell searches the day that I worked."  Defendant Culliver further testified (Culliver Tr. at 162:6-17), "It's very important for us to do the searches.  It's also difficult for us to do searches -- it's difficult for us to do searches when our staffing situations are challenged."  And Defendant Culliver testified (Culliver Tr.

at 166:19 to 167:6) that "[f]or my comfort level, that [amount of searching] would not be adequate."

83.     Defendant Administrative Supervisors and Defendant Prison Supervisors are well aware of the understaffing at St. Clair Prison, and were so aware at the time of Mr. Pettiway's death.  As reported by *The New York Times* in 2017, before Mr. Pettiway's murder Defendant Dunn acknowledged, at St. Clair and other prisons, "[T]he fundamental, systemic problem is a combination of lack of staff and overcrowding."

84.     The 2019 DOJ Report described the acute awareness of Defendant Dunn and the ADOC of the substantial risk of harm caused by dangerous level of understaffing, stating the staffing at Alabama prisons was "at a crisis level."  For example, the Report cites Dunn's statement to the Alabama Legislature that "there is a direct correlation between the shortage of officers in our prisons and the increase in violence," and acknowledgment that the current level of violence is "unacceptably high."

85.     Based on their respective positions, responsibilities, and experience, each and every Defendant further knew about the St. Clair Prison's staff and security deficiencies from the contemporaneous Duke Litigation, which addressed in detail the broken locks, understaffing, blind spots, and the inadequate supervision of staff at the St. Clair Prison.  These failures contributed to numerous violent incidents at

St. Clair Prison, many of which were stabbings that resulted in serious injury or death, including the following examples detailed in the Duke Litigation:

     **a.** Upon information and belief, in June 2014, Derrick White, who lived in P block, was assaulted in the hallway between P and Q blocks during a movement time by a prisoner who was not assigned to either block. There were no officers present when Mr. White was assaulted. He was strangled and then dragged while unconscious into the showers in Q. He was in the showers from approximately 7:30 a.m. until 1 p.m. and was never found by staff, despite the fact that, upon information and belief, a count was conducted during the time he was missing.

     **b.** In 2013, a prisoner was stabbed multiple times with an ice pick in the St. Clair gym that was left completely unsupervised by St. Clair staff. Then, upon information and belief, in 2014, that same prisoner was attacked again by another inmate, resulting in a section of his ear being cut off.

     **c.** In March 2015, an inmate spent three nights in the infirmary, received 13 staples in his head and suffered a collapsed lung after being stabbed in the middle of the day in the Yard. Because no

officers were present in the Yard, that inmate was forced to go into the cell block and inform the cube officer before he received any help.

86.     Furthermore, based on their respective positions, responsibilities, and experience, each and every Defendant knew of multiple security deficiencies that, when coupled with understaffing, created a substantial risk of harm to inmates: (a) faulty locking mechanisms on the majority of cell doors; (b) blind spots in the housing areas due to limited sight lines; and (c) the lack of surveillance cameras and mirrors.

### iv.     Prison personnel have a long history of engaging in or encouraging violence, weapons, and contraband at St. Clair.

87.     Each and every Defendant also perpetuated the culture of violence at St. Clair described above by either engaging in violence themselves, tolerating and condoning violence by staff members, failing to discipline prisoners for violent acts, or refusing to discipline correctional officers for using excessive force against prisoners.  Upon information and belief, based on evidence in the Duke Litigation, the following are illustrative examples of Defendants' wrongful conduct in this respect:

**a.** In March 2014, after an inmate informed Captain Sanders that he was experiencing issues with another inmate, Sanders replied "you're a big dude; kill him or kill yourself."

**b.** In October 2014, correctional officers beat one prisoner after Defendant Malone told them to "beat his ass" in response to a report that the prisoner had gotten into an altercation with another inmate.

**c.** In September 2015, on the segregation yard, Defendant Malone struck an inmate with his flashlight more than ten times while the inmate's hands were handcuffed behind his back because the inmate did not get to the ground quickly enough when commanded, causing the inmate to bleed out of his head and rendering him unconscious.

**d.** In July 2015, several officers assaulted an inmate in the C-2 block of segregation. The officers handcuffed the inmate with his hands behind his back, threw him to the ground, and kicked him.  After not providing the inmate with medical treatment, the officers held him in a temporary holding cage outside the segregation unit for approximately eight hours.

88.     On July 23, 2020, the Department of Justice supplemented the 2019 DOJ Report with an additional report (the "2020 DOJ Excessive Force Report"), which provided the DOJ's conclusions regarding the use of excessive force in Alabama prisons in connection with its CRIPA investigation.  In that report, the DOJ concluded that the continual use of excessive force occurring within Alabama's prisons gave rise to systemically unconstitutional conditions.

89.     The 2020 DOJ Excessive Force Report provided a horrifying picture of abuse by prison staff on inmates, including at St. Clair.

      **a.** For example, in 2016, a handcuffed prisoner was attacked by a "mob of officers," and beaten with batons, punched and stomped on over the objections of a lieutenant and a sergeant.

      **b.** The DOJ also detailed another example from May 2018, four months before Mr. Pettiway was killed, where a St. Clair corrections officer slapped an inmate, causing swelling to his face and bruising around his eyes, merely for failing to put on clothing when asked.

90.     Multiple additional examples of violent acts by St. Clair personnel, documented in the media and legal documents, demonstrate that the Defendants were aware of, and even participated in, the violent culture that enabled Mr. Pettiway's murder.

91.     In January 2019, for example, a video posted on YouTube showed two St. Clair guards, including a segregation unit supervisor, savagely beating a mentally ill prisoner who had just told officers he was going to kill himself and requested to see mental health staff.  In response, as Unheard Voices OTCJ reported, the supervisor's reprimand consisted of merely being transferred from the segregation unit and instead assigned as a supervisor of the general population units.

92.     Yet, as detailed above, instead of actually addressing threats or other security issues faced by inmates, St. Clair personnel encouraged prisoners to arm themselves with knives.  Indeed, upon information and belief, prison staff have been a central source of weapons for inmates.

**D.     Each Defendant was Subjectively Aware that the St. Clair Inmates Were at Substantial Risk of Serious Harm Due to Excessive Inmate-on-Inmate Violence.**

93.     Based on their respective positions, responsibilities, and experience, each and every Defendant knew that the combination of these security deficiencies gravely contributed to numerous violent incidents in the years preceding Mr. Pettiway's murder.  Each and every Defendant also knew that his or her failure to adequately supervise inmates created a dangerous environment conducive for inmates to assault and murder other inmates, such as the violent murder of Mr. Pettiway.  Moreover, the lack of adequate staffing contributed to Defendants'

failure to attend to Mr. Pettiway's serious need for medical attention after he was stabbed.

94.    The abuses detailed above have been so rampant over such a long period of time, that, based upon information and belief, the substantial risk to the prison population at St. Clair is obvious simply from being present in the prison.

95.    Moreover, each and every Defendant has been exposed to objective evidence of the systemic culture of violence at St. Clair.  For example:

      **a.** Defendant Culliver testified at his deposition in the Duke Litigation that he reviews monthly statistical reports from each facility and investigative reports that detail violence and assaults at St. Clair, and that incident reports, including those that involve homicides, are circulated to officers, the Warden and the Commissioner.  (Culliver Tr. at 24:17 to 28:22).

      **b.** In June 2014, EJI sent a letter to the Commissioner of the Alabama Department of Corrections requesting an immediate change in leadership at St. Clair.  The letter alerted the Department of the unacceptable level of violence and corruption at St. Clair, and warned that "further ignoring the situation will lead to serious and tragic outcomes."  On information and belief, based on their respective positions, responsibilities, and experience, each and

every Defendant was aware of the 2014 EJI letter and the circumstances described therein.

96.    Additionally, these abuses have been long-standing, pervasive, well-documented in media reports, as to which, on information and belief based on their respective positions, responsibilities, and experience, each and every Defendant was aware of the circumstances described therein.  For example:

**a.** In 2014, *Vice* discussed the rampant violence, prevalence of weapons and contraband, and corruption St. Clair at length, declaring St. Clair as "[o]ne of the most violent places in America."

**b.** In 2017, the *Montgomery Advertiser* reported on the ADOC's failures, focusing particularly on the understaffing, lack of inmate supervision, availability of weapons and contraband and violence at St. Clair.

**c.** In 2017, the *New York Times* reported on the egregious conditions in St. Clair, noting that "[i]n recent years, even by the standards of one of the nation's most dysfunctional prison systems, St. Clair stood out for its violence."

       **d.** In 2019, Birmingham's WSFA12 News dubbed the ADOC prison system "America's Most Violent Prison" based  years of reporting and described it as  "a slaughterhouse."

       **e.** In 2019, *Splinter* reported on the conditions at St. Clair, stating that it "has long been infamous for violence and despair."

       **f.** In 2019, *Mother Jones* published an article in which it stated that "Alabama has one of the highest rates of prison deaths in the country, and St. Clair in particular has long been known for its brutality."

97.    The excessive inmate-on-inmate violence and substantial risk of harm at St. Clair has also been detailed in court documents.  For example:

       **a.** As the DOJ noted in its 2019 report, the *Duke v. Dunn* class action lawsuit on behalf of inmates at the St. Clair Prison, seeking injunctive relief to reduce the ongoing violence at the St. Clair Prison, put the ADOC on notice of the substantial risk of serious harm and abuses at St Clair, which ended in a 2017 settlement in which the ADOC made a number of promises to remedy the harms alleged here.  Moreover, that lawsuit named Carter, Dunn, and Malone, all of whom are Defendants in the present case, as

defendants and each served in that lawsuit, and thus were individually aware of the information set forth in the complaint in that case. On information and belief, based on their respective positions, responsibilities, and experience, each and every Defendant herein was aware of the Duke Litigation and the circumstances set forth therein, at the time of Mr. Pettiway's assault and murder.

b. As mentioned above, nationally-recognized corrections expert Steve J. Martin issued an expert report in the Duke Litigation stating: "The frequency of assaults resulting in life-threatening injuries is quite simply among the highest I have observed in my 43-year career in corrections." Each of the defendants in the Duke Litigation who also is a Defendant herein was aware of Mr. Martin's report and, on information and belief based on their respective positions, responsibilities, and experience, each and every Defendant herein was aware of that report and the circumstances described therein at the time of Mr. Pettiway's assault and murder.

98. The abuses at St. Clair have also been well-documented by the Department of Justice in their 2019 and 2020 reports, both of which were sent

directly to Defendants Dunn and Karla Jones, and, based on their respective positions, responsibilities, and experience, each and every Defendant was aware of the circumstances described therein.  Specifically:

  a. The 2019 DOJ Report explicitly states that "ADOC has long been aware that conditions within its prisons present an objectively substantial risk to prisoners."  The report goes on to note that the DOJ's investigation "into the violence, contraband, corruption, and harm occurring in Alabama's prisons evidences issues previously known to ADOC" and that "several years before [the DOJ] initiated [its] investigation, ADOC was acutely aware of extensive problems at St. Clair."  Moreover, on information and belief, based on their respective positions, responsibilities, and experience, although the DOJ's findings were not released until 2019, each and every Defendant was aware that the DOJ was conducting a CRIPA investigation into the excessive violence at St. Clair when it began in 2016.

  b. Like the 2019 DOJ Report, although the DOJ's excessive force findings were not released until 2020, on information and belief, based on their respective positions, responsibilities, and experience, although the DOJ's findings were not released until

- 37 -

2019, each and every Defendant was aware that the DOJ was conducting a CRIPA investigation into the prevalence of excessive force at St. Clair when it began in 2016.

99.    Finally, the widespread abuses at St. Clair, including systemic violence, understaffing, and lack of supervision, have been explicitly acknowledged by multiple Defendants.  For example:

  **a.** As mentioned above, Defendant Dunn admitted in 2017 that it "wo[uldn't] be long until [Alabama prisons were] the most understaffed and most violent," and, in 2019, acknowledged that "the current level of violence [in Alabama prisons] is 'unacceptably high.'"

  **b.** As mentioned above, Defendant Culliver testified during his 2016 deposition in the Duke Litigation that, at St. Clair, "The staffing is short; the staffing is less than desirable; we need to augment this staffing" and that "St. Clair is on the radar, particularly because of the number of incidents that we have, the amount of violence that we have there . . . ."

  **c.** As mentioned above, Defendant Dunn admitted to *The New York Times* in 2017 that, at St. Clair and other prisons, "[T]he

fundamental, systemic problem is a combination of lack of staff and overcrowding."

    **d.** As mentioned above, Defendant Culliver admitted during deposition testimony that searches of inmates' cells at the Prison are "not being conducted every day . . . . I didn't do the cell searches the day that I worked," and also acknowledged that "It's very important for us to do the searches.  It's also difficult for us to do searches -- it's difficult for us to do searches when our staffing situations are challenged."   And Defendant Culliver testified (Culliver Tr. at 166:19 to 167:6) that "[f]or my comfort level, that [amount of searching] would not be adequate."

100.   Based on the litany of sources listed above, it is clear that each and every Defendant was aware that St. Clair suffered from rampant and pervasive inmate-on-inmate violence, which was exacerbated by the well-known and serious deficiencies at the Prison.

101. By reason of their respective positions, responsibilities, and experience, each and every Defendant was on notice, as a result of longstanding, clearly-established Eleventh Circuit case law, that the failure to implement measures to address dangerous prison conditions where "inmate-on-inmate violence occurred regularly" constitutes deliberate indifference to an inmate's

constitutional right to be free from harm from other inmates.  See, e.g., *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1581 (11th Cir. 1995); *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) (it is "clearly established in this Circuit that it is an unreasonable response for an official to do nothing when confronted with prison conditions . . . that pose a risk of serious physical harm to inmates.").

### E.   Each of the Defendants Acted with Deliberate Indifference By Failing to Take Any Reasonable Action to Mitigate the Longstanding Abuses at St. Clair.

102.   Despite knowledge that existing policies and practices were deficient and created a substantial risk of harm to inmates, each and every Defendant failed to take any meaningful corrective action.

103.  Tellingly, in June 2016, the same month Defendant Culliver acknowledged that staffing at St. Clair was "short," "less than desirable" and in need of "augment[ing]," the ADOC's own report showed that only 111 correctional officers were employed at St. Clair, which constituted 44% of its authorized correctional officers at the time.  As of September 30, 2018, the same month as Mr. Pettiway's murder, a Quarterly Staffing Report showed that the number of employed correctional officers had dropped to a total of 83, a mere 28% of St. Clair's authorized correctional officers.  As stated above, on information and belief based on their respective positions, responsibilities, and experience, each and every

Defendant was aware of the ADOC's reports and the circumstances described therein.

104.   Indeed, as the 2019 DOJ report found, despite the ADOC's awareness of the rampant violence in the ADOC prisons, including St. Clair,

"little has changed."

105.   The evidence is overwhelming that each and every Defendant chose to leave inmates, including Mr. Pettiway, exposed to a continuing risk of serious harm as a result of chronic understaffing and deficiencies in policies and procedures to protect inmates, exhibiting deliberate indifference to the safety of the inmates. Defendants, and each of them, made their decisions to take no action or inadequate action knowingly, and irresponsibly, and they must be held to account for those actions, and inaction, including the circumstances that caused the assault and murder of Mr. Pettiway.

## F.   The Deliberate Indifference of Each Defendant Caused Mr. Pettiway's Murder.

106.   Each Defendant was in a position to take actions that could have prevented Mr. Pettiway's murder, but, through deliberate indifference, each Defendant failed to do so.

107.   Instead, and in spite of the Duke Litigation, the DOJ investigation, multiple press reports, and continuous public scrutiny of St. Clair conditions, and

their own personal observations of St. Clair conditions, each and every Defendant failed to take reasonable, necessary, and appropriate steps to address the dangerous conditions at St. Clair, with the result that violence at the prison continued to escalate and culminated in the death of Mr. Pettiway.

### i.     Defendant Administrative Supervisors (Dunn, Culliver, and Ellington)

108.   Defendants   Dunn,   Culliver   and   Ellington   had   supervisory responsibilities over the ADOC, including control over policies and practices relating to St. Clair security, operations, staffing and training.

109.   Defendant Dunn, as ADOC Commissioner, is the highest-ranking official in the ADOC and was responsible for the direction, supervision, and control of the ADOC.

110.   Defendant Culliver, as Associate Commissioner for Operations, was responsible for ensuring the effective and safe daily operations of prison facilities, including overseeing institutional security, staffing, Institutional Coordinators, Correctional Emergency Response Teams, the Classification Review Board, the Training Division, and the Transfer Division.

111.   Defendant Ellington, as Instructional Coordinator for the Northern Region of the ADOC, was responsible for overseeing the St. Clair Prison Warden's management of the Prison's operations, safety, and security.

112.   With knowledge of the extreme violence, mismanagement, and understaffing that plagued St. Clair, each of Defendants Dunn, Culliver, and Ellington could have implemented policies and practices to ensure adequate staffing, adequate supervision, monitoring and training, curtail the widespread availability of contraband weapons and dangerous housing assignments, and reduce violence at St. Clair.

113.   Instead, each of Defendants Dunn, Culliver, and Ellington fostered and enabled the accumulation of weapons through at least the following procedures and practices: (a) the encouragement of violence; (b) inadequate staffing; (c) inadequate patrolling; (d) inadequate monitoring of St. Clair housing blocks; (e) inadequate search procedures; (f) inappropriate responses when weapons were recovered; and (g) failure to take corrective action in response to high rates of violence and assaults.

114.   Specifically, each of Defendants Dunn, Culliver, and Ellington could have and should have taken actions to ensure that inmates like Mr. Pettiway's killer did not have access to weapons, that multiple guards were assigned to the P/Q and L/M housing blocks and the Yard, that guards were not asleep while on duty, and that additional guards would be near enough to defuse violent altercations that had grown commonplace and subsequently administer any necessary medical aid.  Any one of those actions would have greatly diminished the likelihood of Mr. Pettiway's murder.  Accordingly, the deliberate indifference of the each of Defendants Dunn,

Culliver, and Ellington to the well-documented issues at St. Clair caused the murder

of Mr. Pettiway.

> ### ii. Defendant Prison Supervisors (Karla Jones, Estes, Givens, Brooks, Specks, White, Malone, Russell Jones, Dixon, Santa-Maria, and Defendants Unknown Shift Commanders) and Defendants Unknown Corrections Officers

115.   Each of Defendants Karla Jones and Estes, as Wardens of the St. Clair

Prison, was responsible for the day-to-day operations of the Prison, the safety and

security of all inmates at the Prison, and the supervision of all subordinate

employees.  Defendants Karla Jones' and Estes' responsibilities, when each served

as Warden, included ensuring adequate supervision and monitoring of inmates,

adequate classification of inmates, appropriate housing assignments for inmates,

adequate staffing levels, appropriate discipline and deterrence of inmate and staff

misconduct, adherence by staff to search protocols, adequate implementation of

internal security audits, and proper installation, repair, and maintenance of locks,

cameras, and other security devices necessary for safety and security.

116.   Defendant Givens, as Assistant Warden of the St. Clair Prison, had

monitoring and oversight responsibilities at St. Clair that included the classification

and housing assignment process at St. Clair, investigations into inmate-on-inmate

assaults, and reviewing and approving all disciplinary and incident reports at the

prison.

117.   Defendants Brooks and Specks, as Assistant Wardens of St. Clair, had oversight responsibilities at St. Clair that included contraband searches; investigations into inmate and employee misconduct; reviews of such investigations; oversight of inmate movement, including to and from recreation; and safety and security during certain shifts.

118.   Defendants White and Malone, as Captains, were responsible for the safety of all inmates at the prison and the supervision of all security activities and subordinate employees.  As a Captain of General Population, Defendant Malone's duties included authorizing all housing assignments at the St. Clair Prison.

119.   Defendants Russell Jones, as Lieutenant, Dixon and Santa-Maria, as Sergeants, and certain other individuals presently unknown to Plaintiff (the "Unknown Shift Commanders" defined above) were responsible for staffing the housing units where Mr. Pettiway was murdered; overseeing subordinates who supervised Mr. Pettiway's housing unit; and ensuring that security checks were completed in Mr. Pettiway's housing unit.

120.   Mr. Pettiway was vulnerable to attack because of frequent violence at St. Clair; the failure of certain individuals presently unknown to Plaintiff (the "Unknown Correctional Officers" defined above) to monitor the housing units; and the failure by the Defendant Prison Supervisors (as individually identified above) to (a) install an intercom system, cameras, or mirrors to alert other officers about

activities in the housing blocks, (b) adequately staff the Prison, and (c) institute and enforce patrolling policies to combat the pervasive risk of violence inside the St. Clair Prison.

121.   The Defendant Prison Supervisors (i.e., each of Karla Jones, Estes, Givens, Brooks, Specks, White, Malone, Russell Jones, Dixon, Santa-Maria, and Defendants Unknown Shift Commanders) failed to sufficiently staff the prison; failed to maintain adequate security cameras; failed to position correctional officers such that they had adequate sight lines into each housing block and the Yard; and failed to institute and enforce patrolling policies by assigning adequate numbers of correctional officers to consistently patrol the housing blocks.

122.   For example, security staff at St. Clair did not regularly conduct prison-wide searches and other standard prison search protocols and procedures to root out contraband.   Upon information and belief, Defendant Karla Jones chose not to conduct any internal security audits of St. Clair's compliance with search protocols and the level of safety at the institution.

123.   Each of the Defendant Prison Supervisors also turned a blind eye to noncompliance with search protocols at St. Clair.

124.   Upon information and belief, when any of these Defendant Prison Supervisors recovered weapons from inmates, they responded with indifference, often declining to discipline inmates found with knives.

125.   After Defendant Dunn became the Commissioner, he failed to take corrective actions to reduce the substantial risk of harm facing inmates at St. Clair. He also failed to instruct Defendant Karla Jones to implement reforms to improve safety following her appointment as Warden of the St. Clair Prison.

126.   As with each of Defendant Administrative Supervisors identified above and other Defendant Prison Supervisors identified above, Defendant Karla Jones failed to take corrective action to improve safety at the St. Clair Prison.

127.   In addition, on information and belief, certain correctional officers whose identity presently is unknown to Plaintiff (the "Defendants Unknown Correctional Officers" defined above) stationed in the vicinity of the Yard and Mr. Pettiway's housing block on the day of Mr. Pettiway's murder either recklessly failed to monitor the Yard and the housing block, or deliberately ignored the murder while it was happening.

128.   As a result of the failures of each and every Defendant (each of the "Defendant Administrative Supervisors" and "Defendant Prison Supervisors," as defined above), upon information and belief, at the time of Mr. Pettiway's murder, only one ADOC officer was responsible for monitoring the Yard, and that ADOC officer was responding to a gang-related altercation in block L/M while Mr. Pettiway was being murdered outside housing block P/Q.  Upon information and belief, as a result, no officers were on hand to provide immediate medical care or

summon additional assistance. Instead, Mr. Pettiway and a group of prisoners were left to fend for themselves after his stabbing.

## CAUSES OF ACTION

### COUNT ONE
### Violation of the Eighth Amendment to the United States Constitution, Applicable to the State of Alabama through the Due Process Clause of the Fourteenth Amendment, and 42 U.S.C. § 1983
### (Against All Defendants)

129.   Plaintiff incorporates by reference each and every allegation contained in paragraphs 1-128 as if set forth fully herein.

130.   Plaintiff, as the Personal Representative of the Estate of Decedent Terry Terrell Pettiway, brings this claim against Defendants, each of whom deprived Mr. Pettiway of the right to be free from known and unreasonable risk of serious harm while in ADOC custody, in violation of the Eighth Amendment, applicable to the State of Alabama through the Due Process Clause of the Fourteenth Amendment.

131.   Defendants, while acting under the color of state law, recklessly or intentionally deprived Mr. Pettiway of his rights under the Eighth Amendment to the United States Constitution, applicable to the State of Alabama through the Due Process Clause of the Fourteenth Amendment. Defendants failed to take reasonable measures to protect Mr. Pettiway from violence at the hands of other St. Clair Prison inmates.

132.   The prison conditions at St. Clair, specifically the normalized culture of violence, chronic understaffing, corruption, lack of inmate supervision, inoperative locks, the presence of blind spots, and ready access to weapons and contraband, posed a substantial risk of serious harm to Mr. Pettiway.

133.   This substantial risk of inmate-on-inmate violence at St. Clair, exacerbated by the additional conditions recounted in detail above, has been well-documented and widely known for years, including in the years leading up to Mr. Pettiway's death, as chronicled in a multitude of media reports, legal documents, including prior lawsuits filed against multiple Defendants, sued here among others, and multiple reports by the United States Department of Justice.  These circumstances likewise are readily apparent to any individual present on the grounds of St. Clair, and notably any individual whose misfortune it is to be incarcerated there.  Moreover, individual Defendants and/or their subordinates have explicitly acknowledged the substantial risk of harm at St. Clair both in the press and in sworn testimony.

134.   As a result of the rampant and pervasive nature of the violence at St. Clair and the widespread and well-documented prevalence of contraband, weapons, corruption, lack of supervision, blind spots and faulty locks, each Defendant was aware of the substantial risk of serious harm facing each inmate at St. Clair.

135.   Each Defendant consciously disregarded this substantial risk by failing to respond in an objectively reasonable manner to reduce the risk of harm at St. Clair.

136.   Specifically, and without limitation, each of Defendants Dunn, Culliver, Ellington, Jones, Estes, Givens, Brooks, Specks, White, Malone, Jones, Dixon, Santa-Maria, and each of the Unknown Shift Commanders, within the respective authority of each as a supervisor, had knowledge and notice of the widespread history of inmate-on-inmate violence, prevalence of contraband, weapons, corruption, lack of supervision, blind spots and faulty locks at St. Clair.

137.   With such knowledge and on such notice, each of Defendants Dunn, Culliver, Ellington, Jones, Estes, Givens, Brooks, Specks, White, Malone, Jones, Dixon, Santa-Maria, and each of the Unknown Shift Commanders, failed to take any action reasonably calculated to correct or address these barbaric and inhumane conditions.

138.   Each of Defendants Dunn, Culliver, Ellington, Jones, Estes, Givens, Brooks, Specks, White, Malone, Jones, Dixon, Santa-Maria, and each of the Unknown Shift Commanders, failed to enact or follow reasonable policies and procedures designed to provide adequate security and supervision; failing to properly staff the St. Clair Prison with prudent and well-trained correctional officers; failed to address known security deficiencies, such as lack of intercoms, operative security cameras, and mirrors; and exacerbated the risk and condoned the conduct and conditions creating this substantial risk of serious harm at St. Clair Prison.

139.   In addition, and despite having knowledge of the substantial risk of serious harm posed by inmate-on-inmate violence at St. Clair, each of the Defendant Unknown Correctional Officers (whose identity presently is unknown to Plaintiff) stationed in the vicinity of the Yard and Mr. Pettiway's housing block on the day of Mr. Pettiway's murder either recklessly failed to monitor the Yard and the housing block, or deliberately ignored the murder while it was happening.

140.   Each Defendant knew that, by his or her failure to act, St. Clair Prison's dangerous conditions would be insufficient to provide Mr. Pettiway with reasonable protection from violence as they knew they were required to provide.

141.   In engaging in this unlawful conduct, each Defendant was not acting within his or her discretionary authority, and his or her conduct violated the Constitution and clearly established law, including Mr. Pettiway's constitutional right to be protected from physical assault by other inmates and the right to treatment for a serious medical need.

142.   The clearly-established law setting forth the rights of Mr. Pettiway and other individuals incarcerated in Alabama included, without limitation, binding precedent of the Eleventh Circuit, e.g., *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1581 (11th Cir. 1995); *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) (it is "clearly established in this Circuit that it is an unreasonable response

for an official to do nothing when confronted with prison conditions . . . that pose a risk of serious physical harm to inmates.").

143.   Each showed deliberate indifference through his or her reckless or intentional failures to take any actions to safeguard Mr. Pettiway's rights, safety, and well-being. The conduct of each Defendant was objectively unreasonable.

144.   The conduct of each Defendant in violation of Mr. Pettiway's Eighth Amendment rights caused Mr. Pettiway's death.  Each and every Defendant was in a position to avert Mr. Pettiway's murder and, due to the deliberate indifference of each Defendant, failed to do so.

145.   Plaintiff seeks compensatory and punitive damages due to each Defendant's deliberate indifference, in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

## COUNT TWO
**Violation of the Eighth Amendment to the United States Constitution, Applicable to the State of Alabama through the Due Process Clause of the Fourteenth Amendment, and 42 U.S.C. § 1983**
**Deliberate Indifference to Serious Medical Need**
**(Against Defendant Dixon and Defendant Unknown Correctional Officers)**

146.   Plaintiff incorporates by reference each and every allegation contained in paragraphs 1-128 as if set forth fully herein.

147.   Plaintiff, as the Personal Representative of the Estate of Decedent Terry Terrell Pettiway, brings this claim against Defendant Dixon and each of

Defendant Unknown Correctional Officers (whose identity presently is unknown to Plaintiff) for depriving Mr. Pettiway of the right to treatment for a serious medical need in violation of the Eighth Amendment, applicable to the State of Alabama through the Due Process Clause of the Fourteenth Amendment.

148.   Defendant Dixon and each of Defendant Unknown Correctional Officers (as defined above), while acting under color of state law, acted recklessly or intentionally in depriving Mr. Pettiway of his rights under the Eighth Amendment to the United States Constitution.   Defendant Dixon and each of Defendant Unknown Correctional Officers knew of or should have known that Mr. Pettiway was in serious need of medical treatment after being attacked, and failed to obtain medical treatment for him or take steps to warn others that Mr. Pettiway needed medical attention.   Given the severity of Mr. Pettiway's wounds, his medical need was so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

149.   Defendant Dixon and each of Defendant Unknown Correctional Officers delayed medical treatment to Mr. Pettiway, leaving his fellow inmates to transport him to prison facilities and to perform CPR, as they knew they were required to provide.   The immediate failure to provide treatment, and the delay in bringing Mr. Pettiway to the hospital, resulted in his death after being brutally stabbed by a fellow inmate or inmates.

- 53 -

150.    The clearly-established law setting forth the rights of Mr. Pettiway and other individuals incarcerated in Alabama included, without limitation, binding precedent of the Eleventh Circuit and the Supreme Court, e.g., *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (finding it "well established that 'deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment.") (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (emphasis added)); "[d]eliberate indifference can be manifested by prison personnel intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104–05.; *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989) ("This Court has consistently held that knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference.").

151. Plaintiff seeks compensatory and punitive damages due to the deliberate indifference of Defendant Dixon and each and every Defendant Unknown Correctional Officers, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT THREE
### Ala. Code § 6-5-410
### Wrongful Death
### (Against All Defendants)

152.   Plaintiff incorporates by reference each and every allegation contained in paragraphs 1-128 as if set forth fully herein.

153.   Plaintiff brings this cause of action under Alabama Code § 6-5-410, as the Personal Representative of the Estate of Decedent Terry Terrell Pettiway.

154.   The wrongful act, omission, or negligent conduct of each Defendant, as described in detail above, caused the death of Mr. Pettiway while incarcerated at the St. Clair Prison.

155.   Each and every Defendant had a duty to protect Mr. Pettiway from known and unreasonable risks of serious harm, including homicide, by another inmate.

156.   Given the culture of violence at St. Clair well documented in the media and in court documents, and known to each and every Defendant, risk of inmate-on-inmate homicide at St. Clair was foreseeable.

157.   Each and every Defendant consciously disregarded the known risk of harm to Mr. Pettiway by failing to respond in an objectively reasonable manner to reduce said risk of harm at St. Clair.

158. Specifically, and without limitation, each of Defendants Dunn, Culliver, Ellington, Jones, Estes, Givens, Brooks, Specks, White, Malone, Jones, Dixon, Santa-Maria, and each of the Unknown Shift Commanders, within the respective authority of each as a supervisor, had knowledge and notice of the widespread history of inmate-on-inmate violence, prevalence of contraband, weapons, corruption, lack of supervision, blind spots and faulty locks at St. Clair.

159. With such knowledge and on such notice, each of Defendants Dunn, Culliver, Ellington, Jones, Estes, Givens, Brooks, Specks, White, Malone, Jones, Dixon, Santa-Maria, and each of the Unknown Shift Commanders, failed to take any action reasonably calculated to correct these barbaric and inhumane conditions.

160. Each of Defendants Dunn, Culliver, Ellington, Jones, Estes, Givens, Brooks, Specks, White, Malone, Jones, Dixon, Santa-Maria, and each of the Unknown Shift Commanders, failed to enact or follow reasonable policies and procedures designed to provide adequate security and supervision; failing to properly staff the St. Clair Prison with prudent and well-trained correctional officers; failed to address known security deficiencies, such as lack of intercoms, operative security cameras, and mirrors; and exacerbated the risk and condoned the conduct and conditions creating this substantial risk of serious harm at St. Clair Prison.

161. In addition, and despite having knowledge of the substantial risk of serious harm posed by inmate-on-inmate violence at St. Clair, each of the Defendant

Unknown Correctional Officers (whose identity presently is unknown to Plaintiff) stationed in the vicinity of the Yard and Mr. Pettiway's housing block on the day of Mr. Pettiway's murder either recklessly failed to monitor the Yard and the housing block, or deliberately ignored the murder while it was happening.

162.   Because of the relationship between the Defendants and Mr. Pettiway, as well as the foreseeability of the harm that ultimately befell Mr. Pettiway, each and every Defendant is liable for the criminal acts of the third-party assailant or assailants.

163.   As a direct and proximate result of the wrongful conduct of each and every Defendant, Mr. Pettiway was brutally stabbed to death by another inmate on the porch of the P/Q housing unit.

164.   Plaintiff seeks punitive damages in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Carrie Jean Huffman, as Personal Representative of the Estate of Terry Terrell Pettiway, Deceased, respectfully requests that the Court:

(a)   grant judgment in Plaintiff's favor on each of Counts One, Two, and Three asserted herein;

(b)   award compensatory damages against each Defendant, jointly and severally, in an amount to be determined;

(c)     award punitive damages against each Defendant, jointly and severally;

(d)     award reasonable attorneys' fees and the costs of litigation; and

(e)     award such other and further relief as the Court may deem just, proper, and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted this 2nd day of November, 2020.

> *s/Laura S. Gibson*
> Laura S. Gibson
> Alabama Bar No. 8271-O74L
> lgibson@whitearnolddowd.com
> WHITE ARNOLD & DOWD P.C.
> 2025 Third Avenue North, Suite 500
> Birmingham, AL 35203
> Telephone: (205) 323-1888
> Facsimile: (205) 323-8907
>
> *Of Counsel:*
>
> Steven M. Bierman, *pro hac vice*
> sbierman@sidley.com
> John J. Kuster, *pro hac vice*
> *application forthcoming*
> jkuster@sidley.com
> Julia Bensur, *pro hac vice*
> jbensur@sidley.com
> Brian Earl, *pro hac vice*
> bearl@sidley.com
> Leslie Kuhn-Thayer, *pro hac vice*
> lkuhntha@sidley.com

Zachary Payne, *pro hac vice*
zpayne@sidley.com
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

Gregory K. Smith, in his personal capacity,
*pro hac vice*
gs8287@att.com
208 S. Akard St., Office 3042
Dallas, TX 75202
Telephone: (214) 757-3480

Ellen Spano, in her personal capacity, *pro hac vice*
2 Woodhill Drive
Maplewood, NJ 07040
Telephone: (973) 809-4185

*Attorneys for Plaintiff Carrie Jean Huffman, as Personal Representative of the Estate of Terry Terrell Pettiway, Deceased*

## **CERTIFICATE OF SERVICE**

This certifies that I have this day served a true and correct copy of the within and foregoing First Amended Complaint with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following counsel of record:

Charles Richard Hill , Jr.
Robert Flowers Northcutt
W. Jackson Britton
Capell & Howard, P.C.
150 South Perry Street
Post Office Box 2069
Montgomery, AL 36102-2069

Rick.hill@chlaw.com
Bob.northcutt@chlaw.com
Jackson.britton@chlaw.com

This 2nd day of November, 2020.

s/*Laura S. Gibson*
Laura S. Gibson
Alabama Bar No. 8271-O74L