# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **CARRIE JEAN HUFFMAN, AS** | ) | |
| **PERSONAL REPRESENTATIVE** | ) | |
| **OF THE ESTATE OF TERRY** | ) | |
| **TERRELL PETTIWAY,** | ) | |
| **DECEASED,** | ) | **Case No. 4:20-CV-01293-CLM** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JEFFERSON DUNN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Terry Terrell Pettiway ("Pettiway") was stabbed to death while imprisoned at the St. Clair Correctional Facility ("St. Clair"). Carrie Jean Huffman ("Huffman"), as the personal representative of her son's estate, sues 13 individuals who served as officials of the Alabama Department of Corrections ("ADOC"), or prison officials or officers at St. Clair (collectively, "Defendants"), when Pettiway was killed.

Huffman pleads three claims in her amended complaint (doc. 28), but Defendants challenge only the third here. Count III alleges that all Defendants are liable for Pettiway's death under Alabama's Wrongful Death statute, Alabama Code § 6-5-410. Defendants seek to dismiss Count III, plus all fictitious parties (doc. 30).

Accepting as true all facts alleged in Huffman's Amended Complaint, the court finds that Huffman sufficiently pleaded Count III but agrees with Defendants that the fictitious parties should be dismissed. So the court will **GRANT IN PART** and **DENY IN PART** Defendants' motion.

## STATEMENT OF THE ALLEGED FACTS

Huffman pleads the following facts in her complaint, which the court accepts as true for ruling on Defendants' Rule 12 motion.

### A. The Incident

In 2017, Pettiway was arrested while on probation and ordered to serve the rest of his sentence at St. Clair. Pettiway was housed in cell block Q, next to cell block P. Four guards were assigned to monitor P and Q blocks: two cubicle officers, one rover guard, and one officer for the "Yard," an area sitting in the middle of eight general population blocks and accessible to more than 750 inmates. Each cubicle officer managed either cell block P or Q, each containing around 96 inmates. The cubicle officers sat in a protected office and observed inmates by line of sight and cameras. The rover guard monitored 196 inmates in the P and Q blocks and the single officer assigned to patrol the Yard monitored the general populace.

On the afternoon of September 2, 2018, two inmates started fighting outside the P/Q cell block's entrance to the Yard. At the time, the single officer assigned to

the Yard was responding to another incident; the cubicle officers could not see the altercation from their stations; and the roving guard was not in the vicinity.

Pettiway intervened, leading to a disagreement between Pettiway and another inmate. A crowd gathered, and as Pettiway turned to walk away, the other inmate stabbed Pettiway at least 14 times in the back and neck.

Facility officials were not present, so fellow inmates placed Pettiway on a garbage cart and wheeled him to the prison command station. An unnamed correctional officer eventually joined the inmates but refused to aid Pettiway. The same was true for Defendant Dixon and another unnamed correctional officer, who arrived at the command station where the inmates carried Pettiway.

The inmates treated Pettiway's wounds and administered CPR. The officers at the command station called for an ambulance to transport Pettiway to St. Vincent's East Hospital. But their efforts failed, as Pettiway died later that evening.

## B. History of Alleged Abuse at St. Clair

Huffman alleges that Defendants knew that conditions at St. Clair exposed inmates to a significant threat of serious injury. She claims that knowledge came, in part, from "well-documented" previous incidents.

### 1. Alleged Inmate-on-inmate Violence

Huffman pleads the following evidence of inmate-on-inmate violence preceding Pettiway's stabbing in September 2018:

*i.    The United States Department of Justice ("DOJ") Investigations*

The DOJ conducted a Civil Rights of Institutionalized Persons Act ("CRIPA") investigation of the ADOC in 2016 and released its conclusions in 2019. The DOJ concluded that, between 2016 and 2018—which includes the time Pettiway was housed and stabbed in St. Clair—violence and crime was rampant and extreme, and mismanagement was so apparent at Alabama prisons (including St. Clair) that there was "reasonable cause to believe…the conditions in Alabama's prisons for men violate the Eighth Amendment of the U.S. Constitution."

*ii.    Extensive Media Coverage*

Publications such as *The New York Times*, *Vice*, *Mother Jones*, and *Splinter* had labeled St. Clair as one of the "most dangerous prisons in America."

*iii.    ADOC Statistics*

ADOC's statistics reflected a consistent spike in inmate-reported violence before 2018:

| Year | Inmate-reported assaults |
|------|--------------------------|
| 2010 | 28 |
| 2011 | 57 |
| 2012 | 90 |
| 2013 | 101 |

| 2014 | 111 |
| 2015 | 172 |
| 2016 | 240 |

As for 2018, inmates had reported 122 assaults by September, the month Pettiway was stabbed.

Some of these assaults resulted in death. For example, between 2013 and 2018, 35 prisoners were killed in Alabama prisons. Nine of the 35 (26%) happened at St. Clair. The stats are even worse when looking solely at 2018. For example, in September 2018—the month Pettiway was stabbed—one inmate killed himself, another inmate killed an inmate, and 11 other assaults featured inmates or staff. By month's end, the *Associated Press* reported that St. Clair accounted for half of the year-to-date homicides occurring in the ADOC system.

  iv. *Equal Justice Initiative ("EJI") Report*

EJI reported that, in 2018, the homicide rate at St. Clair increased to around 418 homicides per 100,000 incarcerated people, which is more than 50 times higher than the reported national average of 8 homicides per 100,000 prisoners for state prisons in 2016.

*v.* *The Duke Litigation (Duke v. Dunn, 4:14-CV-1952-VEH (N.D. Ala.))*

In October 2014, EJI filed a class action lawsuit on behalf of inmates at St. Clair to seek injunctive relief and reduce the ongoing violence at the St. Clair Prison. The *Duke* complaint, as amended, described the policies and practices fueling the outbreak of violence at St. Clair, including St. Clair personnel failing to address the widespread proliferation of contraband weapons. The *Duke* litigation claimed that the failure to appropriately respond to violence and rape, plus inadequate staffing, supervision, and monitoring, created a dangerous culture of violence and abuse.

2. Alleged Inmate Access to Weapons and Contraband

Huffman alleges that knives and other prison-made weapons were used in about 150 assaults (including murders) at St. Clair Prison since 2015. And prison personnel found firearms and ammunition at least three times between 2015 and 2017.

In 2017, *The New York Times* reported that the estimated percentage of inmates at St. Clair who were armed with some kind of weapon "[ran] from well over half to just about everyone." Similarly, the *Montgomery Advertiser* quoted former St. Clair correctional officer Jonathan Truitt describing weapon contraband as "out of control" and saying that inmates were "assaulted in every way imaginable." Truitt noted that a single 24-person cell block at the St. Clair Prison could contain anywhere from "30 to 40" contraband knives.

Huffman alleges that, when Pettiway was stabbed in 2018, St. Clair personnel knew that the inmate population was heavily armed; in fact, certain personnel encouraged inmates to obtain and use their weapons. Huffman lists these examples:

- WBRC Fox 6 reported that prison personnel sold two St. Clair inmates hacksaw blades, bolt cutters, and a handgun that they then used to escape in 2017;

- An inmate who was stabbed repeatedly by another inmate alleged in his complaint against many of the same defendants named here that "[w]hen [he] arrived at St. Clair, a correctional officer immediately told him about the rampant violence at St. Clair and advised him that he would need a knife;" and,

- An officer reassigned inmate Robert Woods to a violent block where his advanced age and physical disability placed him in a vulnerable state. When Woods expressed fear for his safety, the officer responded that he would get Woods a knife if he did not already have one. After suffering from a theft, Woods requested again to be moved from the block. In response, the officer placed several box cutters on a table and told Woods to make a knife to protect himself.

Huffman says these illustrations were publicly available, so every Defendant was personally aware of the substantial risk of violence inmates faced at St. Clair because of widespread proliferation of weapons and lack of adequate supervision.

3. <u>Alleged Staffing Shortages, Inoperative Locks, Blind Spots, and Deficiencies in Inmate Supervision and Protection</u>

Huffman also alleges that St. Clair was understaffed on the day that Pettiway was stabbed to death. She points to the 2019 DOJ Report that concluded St. Clair only employed 28% of its authorized correctional officers three months before an

inmate stabbed Pettiway. Huffman quotes testimony that Defendant Culliver gave during his deposition for the *Duke* litigation: "The staffing is short; the staffing is less than desirable; we need to augment this staffing."

Huffman argues that understaffing interfered with critical security functions, such as inmate monitoring and regular searches for weapons and contraband. Huffman argues that the additional failures of broken locks, blind spots, and inadequate inmate supervision detailed in the *Duke* litigation contributed to many violent incidents at St. Clair and includes these examples from court documents:

- In 2013, a prisoner was stabbed multiple times with an ice pick in the St. Clair gym, which had been left unsupervised. The same prisoner was attacked again in 2014 by another inmate, causing a section of his ear to be cut off.

- In June 2014, a prisoner not assigned to either P or Q blocks assaulted Derrick White, an inhabitant of P block. No officers were present when White was attacked. The inmate strangled and then dragged an unconscious White into the Q block showers. White laid in the showers from around 7:30 a.m. until 1:00 p.m. before staff located him, even though a count occurred during the time he was missing.

- In March 2015, an inmate spent three nights in the infirmary, received 13 staples in his head and suffered a collapsed lung after being stabbed in the Yard during the middle of the day. Because no officers were nearby, the inmate had to walk into the cell block to inform the cube officer that he needed help.

Huffman also provides more deposition testimony from Defendant Culliver concerning cell searches:

- Searches "are not being conducted every day . . . . I didn't do the cell searches the day that I worked."

- "It's very important for us to do the searches. It's also difficult for us to do searches -- it's difficult for us to do searches when our staffing situations are challenged."

- "[F]or my comfort level, that [amount of searching] would not be adequate."

In addition, the St. Clair general population housing units usually contain about 96 inmates that are monitored by a single correctional officer from the vantage point of a protected cubicle. This "cube" has windows that give the officer limited sight lines into both sides of the block, but leave much of the block and Yard outside the officer's view. Huffman alleges that the roving officers assigned to patrol the housing blocks are often pulled away from their stations to escort inmates and serve in other capacities. Huffman also asserts that, although St. Clair installed cameras to cover the areas that cannot be seen from the cube's vantage point, the cameras were rarely operational due to malfunction or intentional damage inflicted by prisoners.

4. <u>Alleged Perpetuation of and Participation in Violence, Weapons, and Contraband by St. Clair Personnel</u>

Huffman alleges that each Defendant failed to act in response to these dangerous conditions at St. Clair and instead engaged in and perpetuated the violence by failing to discipline prisoners for violent acts and refusing to discipline correctional officers for using excessive force against prisoners. In support, Huffman

provides specific examples of Defendants' alleged wrongful conduct from the *Duke* litigation:

- In March 2014, after an inmate informed Captain Sanders of the inmate's issues with another prisoner, Sanders replied "you're a big dude; kill him or kill yourself."

- In October 2014, correctional officers beat one prisoner after Defendant Malone told them to "beat his ass" in response to a report that the prisoner fought another inmate.

- In September 2015, on the segregation yard, Defendant Malone struck a handcuffed inmate with his flashlight more than ten times because the inmate did not get to the ground quickly enough when commanded, causing the inmate to bleed out of his head and rendering him unconscious.

Again, Huffman alleges that, rather than dealing with similar reports themselves, St. Clair officials encouraged prisoners to arm themselves with weapons and other forms of contraband.

## C. Defendants' Alleged Knowledge of Substantial Risks

Huffman alleges that the above incidents/problems were so rampant, for so long, that Defendants had to know about the risk faced by inmates because it was "obvious simply from being present in the prison." FAC ¶ 94. But Huffman does not stop there. She also pleads the following publicly available information put Defendants on notice of the dangerous conditions at the prison:

1. ADOC

In June 2014, EJI sent a letter to the Commissioner of the Alabama Department of Corrections requesting an immediate change in leadership at St. Clair. The letter alerted ADOC about the level of violence at St. Clair and warned that "further ignoring the situation will lead to serious and tragic outcomes."

2. Local and National Media Coverage

Huffman alleges that these reports by local and national media outlets described the dangerous conditions at St. Clair prison:

- In 2014, *Vice* discussed the rampant violence, prevalence of weapons and contraband, and corruption St. Clair at length, declaring St. Clair as "[o]ne of the most violent places in America."

- In 2017, the *Montgomery Advertiser* reported on the alleged ADOC failures, focusing particularly on the understaffing, lack of inmate supervision, availability of weapons and contraband and violence at St. Clair.

- In 2017, *The New York Times* said of the conditions at St. Clair: "[i]n recent years, even by the standards of one of the nation's most dysfunctional prison systems, St. Clair stood out for its violence."[1]

3. Court Documents

The DOJ said in its 2019 report that the *Duke* class action lawsuit put the ADOC on "notice" of the substantial risk of serious harm and abuses at the prison. The *Duke* lawsuit ended in a 2017 settlement and an ADOC promise to remedy the

---

[1] Huffman also includes articles that post-date Pettiway's stabbing. The court does not recite them because Defendants could not have read or heard about these articles when Pettiway was stabbed.

harms alleged at the prison. Current defendants Dunn and Malone were also defendants in *Duke*, so Huffman alleges that (at least) Dunn and Malone were aware of the information pleaded in the *Duke* complaint.

### 4. 2019 DOJ Report

The 2019 DOJ Report, which DOJ sent to Defendants Dunn and Jones, states that "ADOC has long been aware that conditions within its prisons present an objectively substantial risk to prisoners." The report notes that DOJ's investigation "into the violence, contraband, corruption, and harm occurring in Alabama's prisons evidences issues previously known to ADOC" and that "several years before [the DOJ] initiated [its] investigation, ADOC was acutely aware of extensive problems at St. Clair." While Defendants could not have read this 2019 report before Pettiway was stabbed in 2018, Huffman alleges that every Defendant knew of the DOJ's investigation into the excessive violence at St. Clair when it began in 2016.

### 5. Defendants' own statements

Defendant Dunn stated in 2017 that it "won't be long until [Alabama prisons are] the most understaffed and most violent." Defendant Dunn also told *The New York Times* in 2017 that, at St. Clair and other prisons, "the fundamental, systemic problem is a combination of lack of staff and overcrowding."

Defendant Culliver testified during his 2016 deposition in the *Duke* litigation that, at St. Clair, "The staffing is short; the staffing is less than desirable; we need to

augment this staffing" and that "St. Clair is on the radar, particularly because of the number of incidents that we have, the amount of violence that we have there."

## D. Defendants' Alleged Deliberate Indifference

Based on these facts, Huffman alleges that Defendants knew their policies and practices were deficient and that deficiency created a substantial risk of harm to inmates in September 2017. Yet no Defendant took meaningful corrective action.

In support, Huffman points to the 2018 ADOC staffing report for St. Clair, which shows a drop from 111 officers in 2016 to 83 officers in 2018. The latter number (83 officers in 2018) amounts to 28% of St. Clair's authorized correctional officers. Huffman alleges that since receiving this report, St. Clair has not acted to bolster its staffing to acceptable levels.

## STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, the court must take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007).

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 8 does not require "detailed factual allegations," but does demand more than "an unadorned, 'the-defendant-unlawfully-harmed-me' accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A pleading

that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient. *Id*. The complaint's assertions must find support through further "factual enhancement." *Id*.

Rule 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. A complaint states a facially plausible claim for relief when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. This standard of plausibility asks for more than a "sheer possibility" that a defendant has acted unlawfully. *Id*.

## ANALYSIS

### I. Wrongful Death (Count III)

Huffman alleges in Count III that the wrongful act, omission, or negligent conduct of each Defendant in their individual capacities caused the wrongful death of Pettiway. Doc. 28 ¶¶ 1-128. Huffman pleads this claim under Alabama Code § 6-5-410, which provides:

> A personal representative may commence an action and recover such damages as the jury may assess in a court of competent jurisdiction within the State of Alabama, and not elsewhere, for the wrongful act, omission, or negligence of any person, persons, or corporation, his or their servants or agents, whereby the death of his testator or intestate was caused, provided the testator or

intestate could have commenced an action for such wrongful act, omission, or negligence if it had not caused death.

Ala. Code § 6-5-410 (1975).

Defendants argue that the court should dismiss Count III, as pleaded, for either of two reasons: (1) Huffman fails to plead a specific act or omission that attaches to each individual defendant and (2) each Defendant has State agent immunity. The court addresses each below.

**A. Individual pleading**

To properly allege wrongful death, Huffman must plead the basic tort elements of duty, breach, causation, and damages at a minimum. *See Vinson v. Clark Cnty.*, 10 F. Supp. 2d 1282, 1303 (S.D. Ala. 1998). Defendants allege that Huffman "should be required to assert some specific act, omission, or negligence on the part of each Defendant that caused the death." Doc. 31 at 3. But Defendants cite no authority for this proposition (thus the phrase "*should be* required"), and Defendants abandon this argument in their reply brief. *See* Doc. 38.

In her complaint, Huffman asserts that each individual Defendant had a duty to protect Pettiway from known and unreasonable risks of serious harm from inmate-on-inmate homicide. Doc. 28 ¶ 155. She then pleads that each Defendant breached this duty by consciously disregarding and failing to reduce the known risk of harm at St. Clair. *Id.* ¶¶ 156-160. Huffman alleges that Defendants caused Pettiway's death

by failing to correct the known risk of violence and death at St. Clair; a failure that led to someone stabbing Pettiway while no prison officials were present. *Id.* ¶¶ 162-163.

In short, Huffman pleads all the necessary elements: duty, breach, causation, and damages. And at the Rule 12 stage, the court must assume that Defendants knew about all the pre-attack incidents and statistics that Huffman pleads and thus Defendants knew or should have known that "St. Clair was a place where inmate-on-inmate murders were the norm, rather than isolated occurrences." Doc. 38 at 8-9 (Defendants' rely brief). Because the court assumes these facts are true, the court finds that Huffman sufficiently pleaded Count III.

### B. State-Agent Immunity

Defendants next argue that Huffman's wrongful death claim must be dismissed because Defendants are protected by state-agent immunity. Formerly known as qualified immunity, state-agent immunity "protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities" and is a question of law determined by the trial court case-by-case.[2] *Brown v. City of Huntsville*, 608 F.3d 724 (11th Cir. 2010) (quoting *Ex parte Hayles*, 852 So.2d 117, 122 (Ala. 2002)); *see also Ala. State Univ. v. Danley*, 212 So. 3d 112

---

[2] While the doctrines are similar, state-agent immunity differs from qualified immunity because state-agent immunity requires the defendant's conduct to fall within an enumerated category, rather than within the scope of the agent's discretionary authority. *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991).

(Ala. 2016) (noting name change from "discretionary" to "state-agent" immunity).

In *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000), the Alabama Supreme Court set up a two-step, burden-shifting analysis to analyze claims of state-agent immunity. In step one, the supreme court said that the defendant must show that his conduct fits within one of these immunized categories:

- The formulating of plans, policies, or designs;

- Exercising judgment in the administration of a department or governmental agency, for example, hiring, firing, transferring, assigning or supervising personnel or allocating resources;

- Discharging duties imposed on a department or agency by statute, regulation, or rule in the manner prescribed by the statute, regulation, or rule;

- Exercising judgment in the enforcement of the criminal laws of the State; and,

- Exercising judgment in the discharge of duties imposed by statute, rule, or regulation, such as releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

*Id*. at 405. The supreme court later said that this list of immunized categories is "illustrative," not exhaustive. *See Ex parte Randall*, 971 So.2d 652, 664 (Ala. 2007). But this court needn't delve into the scope of the categories because Huffman does not contest that Defendants' actions fall within one of the categories (doc. 37 at 17), meaning that Huffman concedes that Defendants can meet their burden in Step One.

Instead, Huffman argues that she can prevail in Step Two, which requires the Plaintiff to show that one of the two "*Cranman* exceptions" applies:

- When the Constitution or laws of the United States, the Constitution of Alabama, or the laws, rules, or regulations of Alabama enacted or promulgated for regulating activities of the governmental agency require otherwise; or,

- When the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

792 So. 2d at 405. Before the court addresses the exceptions, however, it notes that the Alabama Supreme Court has stated that the determination of state-agent immunity is a fact-intensive question generally fit for the summary judgment stage; not the motion to dismiss stage. *See Ex parte Ala. Dep't of Mental Health & Mental Retardation*, 837 So.2d 808, 813-14 (Ala. 2002) (it is a "rare case involving the defense of [State-agent] immunity that would be properly disposed of by a dismissal pursuant to Rule 12(b)(6)") (referencing *Ex parte Butts*, 775 So.2d at 177 (quoting in turn *Patton v. Black*, 646 So.2d at 10 (Ala. 1994)). "[I]t is not for this court to determine, based on the complaint, whether the plaintiff will ultimately prevail, but only if he may possibly prevail." *Ex parte Ala. Dep't of Mental Health & Mental Retardation*, 837 So.2d 808 at 814 (quoting *Patton*, 646 So.2d at 10). So "unless the inapplicability of all the Cranman exceptions is *clear* from the face of the complaint, a motions to dismiss based on state-agent immunity must be denied." *Odom v.*

*Helms*, 2020 WL 3478897 at n.3 (Ala. 2020).

The first *Cranman* exception says that "a State agent *shall not* be immune from civil liability in his or her personal capacity when the Constitution or laws of the United States, the Constitution of Alabama, or the laws, rules, or regulations of Alabama enacted or promulgated for regulating activities of the governmental agency require otherwise[.]" *Cranman*, 792 So. 2d at 405. The Eleventh Circuit has held that if a state official "potentially" violated an individual's constitutional rights, state-agent immunity is unavailable as an affirmative defense under this exception. *See Taylor v. Hughes*, 920 F.3d 729 (11th Cir. 2019) (holding defendants are not immunized from liability under state law if they violated constitutional rights); *Foster v. Maloney*, 785 Fed. Appx. 810 (11th Cir. 2019) (holding "plausible" deliberate indifference to serious medical needs claim stripped officials of state agent immunity for state law claims).

In Count I of her amended complaint, Huffman alleges that all Defendants violated Pettiway's Eight Amendment rights, including his "right to be protected from physical assault by other inmates and the right to treatment for a serious medical need." Doc. 38 ¶ 141. Because Huffman does not allege that any of the named Defendants (excluding Dixon) were directly involved with Pettiway's death, Huffman seems to proceed on a "history of widespread abuse" theory of liability to establish a causal link between the ADOC officials and the alleged constitutional

violation. *See Doe v. Sch. Bd. Of Broward Cnty., Fla.*, 604 F.3d 1248, 1266 (11th Cir. 2010) (holding administrators may establish liability against indirectly involved defendants through history of widespread abuse theory that put officials "on notice" of safety risks); *LaMarca v. Turner*, 995 F.2d 1526, 1536-38 (11th Cir. 1993) (holding prison official's failure to ensure adequate supervision and monitoring of violent inmates constituted Eighth Amendment violation).

At the Rule 12 stage, Huffman need only allege events and circumstances that suggest such a history of widespread abuse existed. *See Shook v. Dunn*, 2020 WL 1492841 (M.D. Ala. 2020). Tellingly, Defendants do not seek dismissal of Count I, meaning that Defendants essentially concede that Huffman satisfied her pleading burden. So the court finds that Huffman has sufficiently pleaded facts that could establish an Eighth Amendment violation. Because Huffman has sufficiently pleaded a Constitutional violation, she has pleaded enough facts to satisfy the first *Cranman* exception. *See Taylor*, 920 F.3d 729; *Foster*, 785 Fed. Appx. 810. As a result, the court needn't discuss the second *Cranman* exception.

\* \* \*

Again, under Alabama law, the court can dismiss a claim on state-agent immunity grounds at the Rule 12 stage only when it is clear from the face of the complaint that neither *Cranman* exception applies. *Odom*, 2020 WL 3478897 at n. 3. Because the first *Cranman* exception applies, the court must deny Defendants'

motion to dismiss Count III on immunity grounds. *Id.*

## II. Fictitious Parties

The court limits its discussion about Huffman's pleading of fictitious parties because it is largely academic. The parties agreed to frontload discovery "sufficient to identify each of the Unknown Shift Commanders and the Unknown Correctional Officers as pled in the First Amended Complaint." Doc. 43 at 10. And the parties agreed to allow Huffman to amend her complaint if that discovery "reveal[ed] the need." *Id.* at 10-11. The court recently extended Huffman's deadline to amend her complaint until September 29, 2021 (doc. 52), nearly eight months after discovery began. The court expects the disagreement over fictitious party pleading will work itself out during that time.

That said, the court must address the motion before it. But only briefly.

\* \* \*

Huffman pleaded two groups of fictitious Defendants:

¶23: Each of Defendants Unknown Shift Commanders was a shift commander on duty in the L/M and P/Q Blocks at the St. Clair Prison on the date of Mr. Pettiway's murder on September 2, 2018. . . .

¶25: Defendants Unknown Correctional Officers were correctional officers at the St. Clair Prison at the time of the events at issue in Plaintiff's Complaint. Defendants Unknown Correctional Officers were responsible for supervising and monitoring Mr. Pettiway's housing unit and the areas where these events took place at the St. Clair Prison on September 2, 2018.

Doc. 28 at 9. The parties agree that Huffman's pleading of fictitious parties violates the Eleventh Circuit's general rule that fictitious-party pleading is not permitted in federal court. *See, e.g.*, *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010); *New v. Sports & Recreation, Inc.*, 114 F.3d 1092, 1094 (11th Cir.1997).

But the parties disagree whether Huffman's pleading fits within the Circuit's narrow exception, which requires the plaintiff's description of the fictitious defendant to be specific enough to be considered surplusage, at the minimum. *Dean v. Barber*, 951 F.2d 1210, 1215-16 (11th Cir. 1992). The exception is meant to encompass instances when, for "one reason or another, the plaintiff is unwilling or unable to use a party's real name." *Taylor v. Brooks*, 2020 WL 3129862 (N.D. Ala. 2020) (quoting *Dean*, 951 F.2d 1210 at 1215).

The cases discussing the exception seem to turn on whether the description of the fictitious defendant (a) allows the reader to point to a specific individual or (b) leaves the reader wondering which person(s) out of a group fits the bill. The former is allowed; the latter is not. *Compare Dean*, 951 F.2d at 1215 (holding that plaintiff's pleading of "Chief Deputy of the Jefferson County Jail John Doe" was sufficient because it pointed to a knowable, singular defendant) *with Richardson v. Johnson*, 598 F.3d 734, 738 (11h Cir. 2010) (holding that plaintiff's identification of the defendant as "John Doe (Unknown Legal Name), Guard, Charlotte Correctional Institute" was insufficient in identifying the defendant "among the many guards

employed [there]").

Huffman's pleading of fictitious parties falls outside the exception because it leaves the reader unable to identify the particular individual described. The first group—*i.e.* "[e]ach of Defendants Unknown Shift Commanders was a shift commander on duty in the L/M and P/Q Blocks at the St. Clair Prison on the date of Mr. Pettiway's murder on September 2, 2018" (doc. 28 ¶23)—fails to narrow the group down to a single, identifiable person. Instead, the unnamed defendant(s) could be any number of persons, including persons who were not working when Pettiway was stabbed. The same can be said of the second group of fictitious defendants: "Defendants Unknown Correctional Officers were correctional officers at the St. Clair Prison at the time of the events at issue in Plaintiff's Complaint. Defendants Unknown Correctional Officers were responsible for supervising and monitoring Pettiway's housing unit and the areas where these events took place at the St. Clair Prison on September 2, 2018." Doc. 28 ¶25.

Huffman provides no specific, physical descriptors that could identify any of the unnamed defendants. *Richardson*, 598 F.3d 734 at 736. Nor does Huffman provide an exact, or even estimated, number of individuals in each group of unnamed defendants. When pleading fictitious parties, plaintiffs generally specify the number of unknown defendants by including placeholders such as "John Doe A, B, C." *See Woods v. Liberty Nat'l Life Ins. Co.*, 2018 WL 287762 (N.D. Ala. 2018) (allowing

three fictitious defendants individually identified "G, H, I"); *Isles v. Doe*, 2018 WL 2317969 (M.D. Fla. 2018) (finding John Does labeled 2-8 and identified "simply by a title held by numerous other individuals at the prison" insufficient for exception).

As a result, Huffman did not sufficiently plead the identities of the "Unknown Correctional Officers" or "Unknown Shift Commanders." So the court will grant Defendants' motion to dismiss the fictitious defendants. Of course, Huffman can amend her complaint to identify the now unnamed defendants through September 29, 2021. *See* Docs. 46 (original scheduling order); 52 (order granting extension).

## CONCLUSION

For the reasons stated above, the court will **GRANT IN PART** and **DENY IN PART** Defendants' motion to dismiss (doc. 30). The court will enter a separate order doing so.

**DONE** on June 21, 2021.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE